Number 20-2347, Minnesota, Riley Johannessohn et al. v. Polaris Industries. May it please the court. My name is Douglas Maxmeyer on behalf of Mr. Johannessohn. I think we're here on this 23-F to discuss the seemingly conflicting and confounding decisions under the manifest defect rule and reconciling O'Neill and the cribs that didn't separate where dismissal was affirmed. Zurn where the plumbing was inherently defective but didn't leak and yet class was affirmed. And George where the steel tubing could fail if struck by lightning and was found. In our case, 220,000 ATVs with an inherent heat defect were sold by Polaris. They violated Polaris' own objective sensible ISO NASA supported temperature standards. The evidence shows Polaris hid this from the consumers. They hid it from their own dealers. They asked the CPSC to keep the investigation quiet. After the case was filed, they started doing some recalls followed by a service advisory to try to mitigate some of the heat defect and they subsequently changed the design marketing them as 60% cooler with new side panels. When we showed this evidence to prospective purchasers, when our experts surveyed them, had they known that Polaris had this deformation or burns, they found an 8.8% overcharge on all the purchases. Was it an inherent defect? I mean, you had multiple models here, some of which had defects, other of which I believe there's evidence in the records from Polaris witnesses that they own some of these machines that function just fine. Well, I think the question is what is an inherent defect as opposed to a manifest defect? And I think it's a fair question. It's one that district court here herself struggled with saying, I struggle with the manifest defect. And if you look in the class certification hearing, it's at ECF number 428, page 103. The court literally said, I struggle on this issue of manifest defect. Is it the burn or is it the heat? Well, the defect is the heat. The injury is the overpayment and the court found an ATV didn't melt. That was the director of engineering, Robin Stroot. He also told the board of directors a year before that testimony about all the ATVs being too hot. And if you look in your addendum at pages 96 and 97, you'll see his letter to the board. And I dare not say more on that because it's under seal because to this day, Polaris does not want to share what it knows exactly about these ATVs. All the ATVs exceeded those temperatures. That was our defect. Could they also melt? Yes. Could they cause burns? Uh-huh. Could they cause fires? Unfortunately, they did to some and they had recalls on that, but every single one exceeded their own temperature standards. That is the defect. And if that defect was disclosed, they would have had to charged about 8% less. That is the injury. That is the overpayment, which 100% of the purchasers of these ATVs suffered. And the court found that on summary judgment, the court used the damage model we had for the class with the name representatives. But when the court tried to address it to the absent class members, it kind of went off the rails. It went into this area of, well, what's the defect? Did everybody suffer the defect? How do I define the defect? And the court redefined it in a way that said everyone necessarily must have burns, melting, or discomfort. And that's contrary to CERN, which said external damage is not required. And Halverson reiterated that when he talked about CERN a year later. And it also does not fit at all with this court's ruling in George, where it was viewed as just simple and straightforward that you could have standing if you allege I paid more than I would have had I known about a defect. In that case, a defect which not even the name plaintiff had suffered. All of the name plaintiffs in our case had not only purchased these hot ATVs, but they also had melting burns discomfort. The basic problem here is O'Neill getting infected into this standing analysis because O'Neill is not a standing case. The words Article 3 standing do not appear at O'Neill. It was a motion to dismiss. The name plaintiffs had bought a crib. It hadn't separated. Luckily, their grandson hadn't been injured by it. And the court said basically no harm, no foul. You're a no injury class. You can't go forward under Minnesota law. Two years later in CERN, in a case that was a class case like this, where the question was standing like now, the plaintiffs had experts to show that there was an inherent defect. The court went the other way. The court decided that that was enough. You do not need to see leaking as in CERN. It's not clear why you need to see melting here. And again, unlike in CERN, we actually had recalls. We had defendants acknowledging a defect and trying to fix it, both through his recall, a service advisory, there's a CPSC investigation, and then a redesign. So the court erred here in going into this long merits review, redefining the defect, and basically then picking a winner. And that same review also violated Rule 23B3 in getting into whether or not there was a common defect. Amgen says predominance is not a license for free ranging merits inquiries. This court in Blades v. Monsanto says only decide the factual issues as necessary to determine if there's a case. Here the court decided this is the defect as I'm defining it. And because the 30B6 witness says his ATV didn't melt, basically the case is over. Now, where the court said that was in its standing discussion. It also did reference, as Judge Koba said, some differences in the ATV sizes, where the exhaust pipe was, responses to the service advisories. If your honors look in your you'll see the discussion, the 570s, the testing done on the 570s, the single engine, smaller ones by Polaris, they all exceeded Polaris' standpoints. They all exceeded their temperature standards. They had melting, they had burns, they had complaints, and they decided they needed to change the design. And in fact, lower those temperature specifications from where they had been to something where it wouldn't lead to customer discomfort. So it affected all the models. Counsel, could you, before too much time, more time passes, could you address the whether a question of law predominates? The district court said the Minnesota Consumer Fraud Act can't apply extraterritorially. And it seemed to me that all you had really was the manufacturer in Minnesota, maybe a consumer report telephone line there. Why did the district court err in looking at what the expectations were of the individual consumers, where they purchased their ATV? Tell me a little bit more about why you think that is an error. Sure, there's actually three errors there. There's two errors of law and one of use of discretion. The first one is the presumption. There is no presumption under Minnesota law that says the Consumer Fraud Act cannot apply extraterritorially. And I think the AG also put in a brief. But the court relied upon a case involving Syngenta from Kansas that relied upon a district court opinion in Olson that this court overturned, that said you can't presume against extraterritorial application just because it doesn't say this applies everywhere. If anything, it's the opposite. And there is no Minnesota Supreme Court test for its choice of law factors that say, step one, look at the presumption, because it doesn't exist. It was one that the court came up with that the defendants even now have sort of backed off. And it's now like the last argument in their choice of law section. But the second issue about the connections and really the due process and the arbitrariness, the Supreme Court handled this, frankly, in Allstate versus Hague, where the court found you can have more than one law apply. And you don't just look at the expectations of one party. The question is, is it arbitrary? And the court in Hague said it wasn't arbitrary to apply Minnesota law to an accident that occurred in Wisconsin amongst Wisconsin drivers when the plaintiff's decedent's wife moved to Minnesota. There was still enough connection. Here we have a Minnesota company, ATVs designed, tested, manufactured in Minnesota. The customer care center is in Minnesota. The decision not to tell consumers about this heat defect was done in Minnesota. There is far more connections to Minnesota here than there was in Allstate. And then that gets to the last question, the abuse of discretion part is, did the court error in saying, notwithstanding all that, the Milkovich factors still say it should be where you bought it? It's a closer call. But we believe in this case, consistent with a case called Huddock, that Judge Kobes is going to hear next month, it makes more sense to apply Minnesota law here because the fraud occurred here. This isn't a warranty claim. It's not a contract claim. The fraud occurred where, in Minnesota, where Polaris made the decision, we're not going to tell consumers about this defect. We're going to hope to fix it down the road and skate by until then. So having made that decision then that, nope, Minnesota law does not apply nationally, the court then made errors on the rest of its predominance analysis. It was wrong in the common defect by disregarding Dr. Jordan's testimony in its entirety, basically saying he painted with too broad of a brush. That's not what the court is supposed to do with expert testimony under Blades, under Abgen, under Daubert. That's just not rule 703. The court never mentioned Neil Hanneman's testimony. And then when applying the different states analysis, the court frankly left three out. In the seven lines it devoted to looking at the other states, it never even mentioned New York, Florida, and Missouri. It misapplied the Minnesota Consumer Fraud Act, basically treating as almost talismanic defendant's right to say, I have a rebuttal. I can show evidence on rebuttals so you can't have a class. Well, the court didn't have the custom hair designed by Sandy decision that this court decided in December 2020 that made clear the actually be tied to the reliance you're trying to rebut. It can't just be, you can't just utter, I have a rebuttal right. And in this case, the rebuttal evidence is not discussed by the court at all. And the rebuttal evidence discussed by the defendants in their brief merely is some people might've noticed some heat. Some people might've had some experiences. They can't possibly say the market knew that the ATVs violated Polaris's own standards because those standards they kept under seal. They wouldn't even let people see them. Even now, there's a limit we're able to share. Finally, on superiority, I'll be real fast on this. The court erred there too. The court looked at only one of the four factors. It did not consider anything outside of manageability. And this court, again, in the custom hair design case in 2020, noted that in cases where you're overcharged on average, class is superior. And unless your honors have questions, I'd like to reserve the remainder of my time. I see no other questions you may reserve. Mr. Godfrey. Yes, your honor, may it please the court. My name is Richard Godfrey and I represent Polaris. The district court on March 31st of last year issued a comprehensive 84 page opinion based on fully mature, trial-ready record. All the discovery is done. All the experts are there. Most of the decisions plaintiffs cite in their favor are not in a trial-ready record. They're an immature record. In the exercise of the court's discretion after almost a full day of oral argument, the court took five months to consider the issues and then issued this comprehensive opinion. The jugular issue based upon the court's exercise of discretion before this court, thus follows. Did the district court, Judge Brasel, abuse its discretion in finding that differences in the evidence among Polaris sportsman ATV purchasers regarding the existence of a defect? 43 different ATV models, multiple model years, having different engineering designs and different heat management that differed over time, different facts regarding defect manifestation, causation, knowledge, reliance, materiality, and injury, showed that uncommon proof in individual issues, not common one predominated. Was that an error in the exercise of the court's discretion? We submit it's not under rule 23. Looking at the predominance factor alone, the predominance factor alone, what are the buckets, the outcome determinative buckets of differing facts? First, your honor's question, one of your honor's questions, the existence of a defect. What is the defect? Now, one of the first arguments I made in the complaint here, specifically alleges that most absent class members have had no manifested defect. And the reason that the plaintiff alleges that is because they're seeking to void the limited warrant. You can find that because we've put a slide up at JA 5049. So we start with the fact that Judge Brasel has an admission, a binding judicial admission of the operative complaint that whatever the defect is, because it's defined differently throughout the complaint in this case, whatever it is, it has not manifested for vast percentages of the class. That's in the plaintiff's amended complaint. They've never amended it since the oral argument. That's the framework. In addition, we have abundant evidence that there's been no manifestation. 98% of all owners have never had any complaint about anything. The name plaintiffs, Johansson and Wonder, advertised their vehicles for sale after filing this lawsuit, said they were in great condition, excellent condition, and Wonder sold his. What was the one thing that two of the name plaintiffs never told the third party purchasers? Oh, it's got this heat defect and I'm suing them for it. So, Counselor, is your argument, you're sort of arguing there is no defect. Are you trying to say that the defects are so varied among these 43 ATVs and they're just different that they can't all be together factually? Or are you shifting back to the standing argument? Well, I'm talking about predominance now. Okay. So you're talking about factually, factual predominance. Right. But to answer your question, though, with respect to the defect, it's a little bit like that game of whack-a-mole. Depending upon the brief, it gets redefined. Now it's about this internal temperature standard. Well, first of all, that was not the basis for any purchaser. Polaris never advertised about that. Secondly, Jordan tested three vehicles for one model year. We have 43 different models over 10 model years, hundreds of differences. Third, the evidence, and Judge Brazel found this based upon the engineering evidence. She found this at pages 76 and 77 and 73 of her opinion that the engineering was different. You might have a defect in one Fourth point, it's a product line defect. And what O'Neill says and what Zurn says is product line defects are not sufficient. They must manifest themselves for you to actually have a cause of action. Why is that? The purchaser got what the purchaser bargained for. For nearly all of the class members, they ride, they don't have any heat, they don't have any problems. There's no issue. So the existence of a defect is based on uncommon proof, different engineering treatments, different heat management systems, the engines are constructed differently, the vehicles are different. You can't find another case where all these differences from an engineering perspective and there's allegedly some common defect, except they say the internal heat standards, which no one knows about, and do not manifest themselves in any injury to the consumer. I've covered defect manifestation. There's no evidence of class-wide defect manifestation, but the named plaintiffs themselves are good illustrations of the problems here. For people who claim that these are defects for which they should get compensation, they continued to ride the vehicles. Mr. Pinion bought a used vehicle for his wife after following a lawsuit that's in the class. One of you had named plaintiffs who are complaining about a defect who continued to not only use the product, but purchase new ones. One other point about defect going to your honors question, an unknown but significant percentage of the class modifies their exhaust heat system to make it hotter and fundamentally change it shortly after or at the time of purchase. Mr. Pinion, named plaintiff, did that. Again, going to there's no common existence of a defect and there's no common defect manifestation. Third bucket, causation. We move for summary judgment at the same time. One of the reasons was to tease out the individual factual differences so the court could see actually how this case would be tried. The court found that there were individual factual distinctions and differences in the evidence among the various named plaintiffs. That is consistent with the evidence that we put in about the class. Different people have different experiences with different vehicles. But what it goes to is it shows that there's no commonality even among the named plaintiffs. Then we go to the next bucket, knowledge. We know from the named plaintiffs and the trial court found that the various named plaintiffs had differing levels of knowledge and bought anyway. How do you explain Mr. Pinion who bought another ATV at issue in this case for his wife after he filed this lawsuit? Under plaintiff's theory, he has a claim. Prior owners, Mr. Kelly thought they were too hot before. The named plaintiffs themselves illustrate what the class evidence, the absent members in the computed class evidence reflect that we put into the record. Fact of injury. The plaintiffs say, don't worry. We have this overcharge theory. First, they grossly misinterpret what Judge Brazel found. Look at footnote 17 on page 58 of the opinion. She finds that it could be evidence used to prove individual damages for the named plaintiffs. But why? The named plaintiffs each allege defect manifestation. They each allege burns and they each allege melting. This court and most courts nationwide have been clear that there is no economic loss unless there's an actual product defect manifested. That's O'Neill. That's Briel. That's Wallace. That's even Zurn. Zurn and O'Neill both make the point about the product line defect is not sufficient. It has to be manifested. And of course, the evidence in Zurn is quite different. There, the evidence was 99% plus. The brass fittings would fail before the warranty expired. Here, the plaintiffs allege the contrary in their operative complaint. Counsel, I appreciate your argument on the fact-based point of this, but I would like to hear from you on the extraterritorial application of the Minnesota statute. Sure. The opposing counsel points out that the ATVs are manufactured in Minnesota, all the decisions were made here, and that there's not some sort of a preference for the individual party to pick another law. So why did the district court get that right? Well, the district court analyzed it under three different tests, the due process test, the extraterritorial test, and the five-factor Milkovich standards test. And each one came out to the same conclusion. I guess I would answer first, this court under Hughes, I think, answered the question. That was the analysis under Hughes. And in that case, it had a dramatically negative impact upon the plaintiff. They had no claim whatsoever. But the court applied the law to where the aggregation of contacts was the most significant. So what are the aggregation of contacts that matter here? The named plaintiffs purchased from dealers out of state. In five of the six cases, they had contracts with the dealers, indicating that the law of the state of purchase would govern. True, the dealers were not defendants here, but in terms of the named plaintiffs' expectations, that was their expectation. The alleged injury took place out of state, where they paid the money. One of the named plaintiffs didn't even know where Polaris was based, even after his deposition preparation. He testified he didn't know where they were based. It simply cannot be that Minnesota law is just applied because either the headquarters are there or because the product was designed there. That's not the law of this circuit nor the law of any other circuit. And if you apply the factors, think of it this way. If I'm in the state of Illinois today, I was in the state of Florida a couple of days ago, which is I think a little nicer than Illinois is at the moment. If I was injured in the state of Florida by buying a Polaris vehicle and being injured, I would expect, I think, that Florida law would govern that. I wouldn't expect that Minnesota law would govern that. That's where I would be. But are you suggesting that that's a more significant factor, the expectation of the consumer than where this ATV or are these ATVs were manufactured, designed, corporate decisions made about the very allegations that are in front of the court? I'm suggesting that that's what the law of this court has been. Yes, that's been the Milkovich factors or the five-factor test. That's been the outcome. And that is why many courts have said there's a presumption against their sartoriatorial application. Otherwise, you get into the position where there is a conflict of laws. You cannot explain the Hughes case or the Paris case, this court, the Eighth Circuit, by reaching any other conclusion. The consumer would expect that the consumer protection laws of his or her state would govern and protect him or her where they purchased the product, where they dealt with the dealers. Now, one of the interesting things about the corrected amendment complaint is the corrected amendment complaint refers to the dealer conversations. So the witnesses are, in terms of the plaintiff's position, they purchased from the dealers, they paid the dealers, the economic injury took place to the dealers, whatever knowledge they have is in that state. And their expectations as formed by the contracts that they signed in five of the six cases were outside of the state of Minnesota. But the notion that there should be the expectation that just because you're headquartered in a state or because that's the state that controls, that has not been accepted by the Eighth Circuit and generally not accepted by the courts throughout the country. Did that answer your Honor's question? But the agreement is a different proposition. I want to make sure that I address the question. You've answered. Okay. So we go back then to what does the GIST report do? The GIST report found, based upon these outcome-determinative differing facts, that there was no predominance. It also found that there was no standing, based upon Wallace and a long line of other cases. Now, in fairness, the courts are somewhat split. Some courts treat the lack of manifestation as a standing, Article III issue, no injury. Other courts say we don't need to get that far, it's a matter of law, there's just no claim. So in New York, in the Feinstein case, no claim, it's a matter of law, manifest defect rule. They don't reach the Article III standing issue. Wallace treated it as Article III standing. Under the George case, this court did not address Article III standing in its opinion, but what happened last summer in George was that George, actually, summary judgment was entered in favor of the defendant in George. And one of the reasons the summary judgment was entered in that case was because the defect did not manifest itself. The purchaser got what they bargained for. And so George ends up coming out the right way, from our perspective, but through a circuitous route. So whether you call it standing or fundamental differences in state law, you come off to the same position that the district court reached in our case, which was no valid claim for absent class members. No valid claim means no Article III standing, or they can't be putative absent class members, hence no class. Final comment, then, in terms of this price premium theory. It's not a theory of damages, it's a new theory of liability. They take the position now in this court that all they have to do is prove a price overcharge, reliance, causation, materiality, all that goes away. That's not the law. You can't find a single case that says that's the law. It's a fraud on the market theory they're trying to impute into the consumer fraud acts, which courts have uniformly rejected, that we discussed at some length in the court below, where we marshaled the various cases that have rejected it. But think of how absurd it becomes. You purchase a product. It performs perfectly. You love it. But suddenly now you don't have, you're a member of a class for a fraud consumer fraud act claim, and you get to recover damages. By the way, Ms. Butler, close question on whether she should be admitted, but the district court rejected our Dalbert motion, so take her at face value. 40.6% of the people in her survey said they would pay the same amount or pay more than they paid for their original Polaris. Her survey was 1,186 pages. I read every single one of them. There was not a single negative comment about Polaris with respect to heat or a heat defect. Not a single one. There were many comments about how great Polaris products were. And when they say they have an 8.8% price premium, not quite. That's assuming, expressly assuming that everyone paid the MSRP. Five of the six named plaintiffs did not pay the MSRP, and the evidence is undisputed in the record below that most purchasers do not pay the MSRP. That's their damages theory. It doesn't match the facts, and it shows and it illustrates that the facts are uncommon. They are not common. So this is a simple case where you had a commodity pricing and everyone gets 8.8%. What the district court found was the named plaintiffs had manifested defects. She was not going to say they couldn't use their 8.8% theory to try to prove that some portion of that applied. But it wasn't that they could get 8.8%. One final comment on that. Why don't you wind up, Mr. Guthrie? You've run out of time, so we'll let you make your final comment unless there's other questions from the audience. Well, thank you. We would ask that the court affirm the exercise of discretion. My final comment was the position they're taking in this court now is contrary to what they told Judge Brazel on what this theory means. You can see that pages 177 to 183 of the transcript of the oral argument hearing. Judge Brazel specifically asked them the question, and they specifically said no. It does not solve, it doesn't provide all the materiality, etc. But thank you very much for your time. I greatly appreciate it, and we would ask that you affirm the district court's exercise of discretion. Thank you, Mr. Guthrie. Mr. McNamara, I think you have a couple of minutes for rebuttal. I do, and I'll try to address the points as I can best in order. The district court agreed all the states at issue recognize the price premium theory. That's in its summary judgment. On the operative complaint, it's a case you probably don't know about too much. It doesn't get discussed much. Moore v. Walter Koch, 294 FRD 627, Northern District of Alabama. Why does it matter? It's cited in Wright and Miller for the very, very common sense point. The class definition put forth in the complaint is often a working definition, might be tweaked as the pre-certification discovery process sheds light on the contours of the case. That's what happened here. Our amended complaint was done in early 2017. Mr. Stroot was deposed in December of 2017. We didn't learn what we have in front of you in the addendums and the other evidence. We didn't have any of the testing to show that this wasn't a latent defect. This wasn't some people get melting. This was everybody gets an ATV that's too hot. I appreciate Mr. Guthrie conceding that nobody knew what Polaris knew. So the fact that there's discussions with the dealers as to the specifications touch points couldn't possibly be relevant here, couldn't possibly contradict the inference of reliance on the issues you raised specifically about in the individual plaintiffs. The court never addressed typicality here. Another questionable way this was handled, but he made all those points below and the court found them unimpressive, unavailing. It's not surprising that someone who bought an ATV and is not told that there's a defect, that this is out of the norm and they see an ATV worth $6,000 less than the sticker price as Mr. Pena did, decided, well, maybe this one will work out better. But again, those individual issues, according to Tyson, is not enough to deny class. I agree it's a mature record. Dalbert should have been applied to Dr. Jordan's testing. The court did not do that below. I think it's wrong to say that manifest defect is the rule of the land. I suggest, your honors, as we sat on page 23, look at in Ray General Motors, LLG ignition switch, where Judge Furman looked at 43 states after his three opinions. And he said it's the opposite, that the manifestation required state claims for fraud, violations of consumer protection statutes, et cetera. Every disputed claim in every disputed state, the court concludes that manifestation is not a requirement, nor should it be. If you don't get the product you bargained for, you wouldn't have paid what you paid. You shouldn't have paid more for it. As to George, real quickly, I suggest your honors look at the opinion. It literally does say George's assertion of paying more than the CST is worth and the consequent loss in value of the structures are economic injury sufficient to establish Article 3. That was the argument made by a gentleman named Robert Ellis at Kirkland and Ellis. If you read his reply, you'll see that's exactly what they wanted. The defendant succeeded. Ironically, when they got back to the district court, the district court found not only did they have standing, they had a case. They lost. In the end, they couldn't show a defect, but they had standing. We actually showed a defect and we showed standing. Unless your honors have any other questions, I'll shut up now. I see no other questions. Thank you both for your argument here today.